## SNOW et al. v. PERKINS et al.

*(District Court, S. D. New York. June 26, 1889.)*

SHIPPING—GENERAL AVERAGE—NEGLIGENT STRANDING.

Voluntary stranding, made necessary by negligence on the part of the ship, does not entitle the ship-owners to a general average contribution from the cargo saved.

In Admiralty.

*Wm. A. Walker*, for libelants.

*Evarts, Choate & Beaman* and *T. Cleveland*, for respondents.

BROWN, J. The libelants claim a general average contribution for the sacrifice of the bark Oneco, which was voluntarily stranded in April, 1885, at Sagua la Grande, Cuba, for the preservation of the respondents' cargo. The bark of 726 tons was chartered to the respondents to load a cargo of sugar, to be delivered in some port of the United States north of Hatteras. Fully loaded, she drew about 18 feet. On account of the shoal water in the harbor, the port regulations prohibited loading beyond 16 feet 3 inches draft. When loaded to that draft the Oneco proceeded, in charge of a government pilot, about 9 miles to the outer anchorage. She came to anchor on the 10th of April, as the log of that date states, "in 20 ft. of water, 35 fms. of chain, the cayo bearing S. E. by E. and the light W. by N." On the three following days her loading was completed. On the morning of the 14th, a strong wind and sea getting up, at 7 A. M. another anchor was let go. There is no evidence that she dragged her anchors, but in the boisterous weather she struck heavily upon the bottom, breaking the rudder and damaging the keel. The

pumps were manned and signals of distress were kept flying, but no help was obtained, and at the end of the day 36 inches of water was in the well. On the morning of Wednesday, the 15th, the captain returned to Sagua, and came back on Thursday, the 16th, with three surveyors and a lighter. The surveyors recommended beaching the vessel for the preservation of the cargo, so far as possible, which was immediately done. The cargo was thereafter unladen, the vessel stripped, and the wreck sold. The cargo was unloaded under a salvage contract made at Sagua by the master with one Garcia, bearing date the 15th, allowing the salvor 50 per cent. This contract recites that the Onoco was then stranded, and believed to be a total loss. This contract is also certified by the United States commercial agent under that date. During the master's absence on the 15th assistance in pumping had been obtained from the gun-boat Telegrama; but the water had gained on the pumps, and on the master's return the bark had $8\frac{1}{2}$ feet of water in her hold. The surveyors were sent by request of the resident American commercial agent upon the master's application for a survey, two of whom have testified in the cause.

Upon the considerable evidence on this branch of the case there seem to me to be grave doubts whether the beaching of the vessel was for the best interests of the ship and cargo, or was reasonably justified by the circumstances of the situation. The salvage contract with Garcia having been made the day before the survey, the survey can be regarded only as called to justify a foregone conclusion. But no further comment will be made on this part of the case, as I am satisfied that upon other grounds a general average charge cannot be sustained, for the reason that the pounding on the bottom, and consequent leaking of the ship, which was the occasion of the voluntary stranding, arose through negligence on the part of the ship. It is one of the commonly accepted rules in the law of general average that the party whose negligence has made the sacrifice necessary cannot claim contribution. Lown. Gen. Av. c. 1, § 4; Gourl. Gen. Av. 15, and cases there cited; *The Ettrick*, L. R. 6 Prob. Div. 127, 135; *Robinson v. Price*, L. R. 2 Q. B. Div. 91; *The Ontario*, 37 Fed. Rep. 220, 222, and cases there cited; *Ralli v. Troop*, Id. 888, 890. Such is the express provision, also, of several of the continental Codes. Germany, § 704; Italy, § 643; The Netherlands, 700; Spain, § 820; Belgium, § 103. In France the law is the same, without any express provision of the Code. 5 Valroger, Droit Mar. §§ 2001, 2087. The charter in the present case does not adopt the York-Antwerp rules. Taking all the circumstances into consideration, I cannot find that the vessel was anchored in deep water, as the master testifies, but must hold that she was improperly and negligently anchored in shoal water, (20 feet, as the log states,) and negligently allowed to remain there after her loading was completed until she pounded on the bottom in the rough sea that arose on the 14th. The master testifies, indeed, that he repeatedly sounded about the ship, both before and after the pounding began, and that there was from 16 to 20 fathoms of water all around the vessel, and that the entry of "20 ft." in the log is a mistake

for 20 fathoms. But the same entry in the log mentions both feet and fathoms. The entry reads: "Came to anchor in 20 ft. of water, 35 fms. chain, at 4 P. M." It is difficult to believe that the two forms of abbreviation would have been used if fathoms had been meant in both cases. But there are many circumstances that sustain the log, and I have sought in vain for anything to confirm the master's testimony. The protest made soon after and signed by the master, first and second mates, and two seamen, repeats the same statement of the log, the words "feet" and "fathoms" being written out in full. No other witness from the ship, and neither of the surveyors, two of whom were sworn, were examined as to the depth of water where the ship lay. Capt. Keen, one of the surveyors, speaks of the place as a "shoal" which he had found out, and he anchored his vessel a reasonable distance off to keep clear of it. Capt. Charleson speaks of the Oneco as aground. The master, in his application on the 15th to the United States commercial agent for a survey, states that the Oneco had "struck upon a rock or reef." In his testimony he intimates that, though the ship lay in 16 fathoms of water, the rudder and keel struck upon some "lump." But he also testifies that he sounded all about the stern and found no such lump, and he made no further effort to find what it was on which the ship pounded. While it is not absolutely impossible that such a peak arose from a depth of 100 feet to within 20 feet of the surface, it seems scarcely credible that so unusual and extraordinary a thing, if it existed, should excite no interest, remark, or investigation on the part of either the master himself or the other shipmasters, the surveyors, and the salvor and lightermen, who came out to the ship on the 16th. Had there been so dangerous a rock in that vicinity, in deep water, where vessels were accustomed to lie and complete their loading, it seems incredible that no inquiry or investigation should have been made concerning it. The evidence even of the master shows no such interest or investigation, and the testimony of the other witnesses gives no intimation of anything unusual, but treats it as any ordinary shoal on which the vessel had grounded. The master, when asked to explain how the ship could thump on the bottom in 100 feet of water, could give no explanation except the suggestion of a "lump" beneath the keel, which he made no special effort to find, and which is not proved to have existed. In the face of the entry in the log, and the language of the protest, that the ship anchored on the 10th in 20 feet of water, and of the other evidence, intimating nothing unusual, but speaking of the vicinity as a shoal, and the vessel as stranding on the bottom; I must find the master's testimony insufficient to support his theory. If it was permissible to anchor at all in so shallow water as 20 feet, it was not permissible to remain there when the wind shifted or freshened; and I must hold it negligence in the ship, if not to have anchored in that depth at all, at least not to have taken care that the ship was hauled out into deeper water before any such change in the wind and sea arose as made her berth palpably dangerous, and produced the injuries on account of which she was stranded. This negligence being the efficient cause of the sacrifice, the libel must be dismissed.